71 N.J. Super. 519 (1962)
177 A.2d 481
MINNA A. MERCNER, PLAINTIFF-RESPONDENT,
v.
GRACE N. FAY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 18, 1961.
Decided January 24, 1962.
*521 Before Judges GOLDMANN, FOLEY and MOLINEUX.
Mr. John M. Boyle argued the cause for respondent (Messrs. Sauer and Boyle, attorneys; Mr. Daniel J. Russell, on the brief).
Mr. H. Frank Pettit argued the cause for appellant (Mr. Pettit, on the brief).
The opinion of the court was delivered by MOLINEUX, J.C.C. (temporarily assigned).
This is an appeal from a judgment awarding plaintiff a real estate commission on a sale of defendant's home. The case was tried below without a jury on a stipulation of facts and on depositions together with certain exhibits hereinafter mentioned.
Defendant, desirous of selling her property, signed a multiple listing agreement in a form drawn up and used by the Westfield Board of Realtors. The pertinent provisions of the listing agreement were as follows:
 "TO ALL ACTIVE BROKER MEMBERS
 WESTFIELD BOARD OF REALTORS,
 WESTFIELD, NEW JERSEY
In consideration of the listing broker listing said property with all the active broker members of Westfield Board, and of their efforts to find a purchaser or tenant for same, the undersigned, as owner, hereby gives to said active broker members of the Westfield Board of Realtors the exclusive right to sell, lease or exchange the property described on the reverse side hereof, at the price and on the terms as therein stated, and the undersigned further agrees to pay to the listing broker, or to the active broker member of said Westfield Board making the sale, lease or exchange, a commission on said price or rental, or on any other price or rental accepted, at the rates established by the said Board as herein set forth if the property is sold, leased or exchanged by an active broker of said Board, by me, the owner, or through any other source before this agreement expires.
The payment to the listing broker member, or to any other active broker member of said Board, who shall make the sale, lease or exchange, shall release the subscriber from all claims of, or liabilities to, any of the active broker members of said Board for the said *522 respective commission or commissions so paid on said sale, lease or exchange of said property.
Commissions on sales or exchanges shall be due and payable on date set for closing of title.
This agreement is made for the benefit of all the active broker members of the Westfield Board of Realtors."
(Emphasis added. The italicized phrase was typed in place of "when the price and terms are arranged between the buyer and seller or the contracts signed.")
On the reverse side of the listing agreement the details of the house and property offered for sale are set forth. The proposed price is therein fixed at $55,000. Under the item "Remarks" is set forth the following: "All papers to be approved by [defendant's attorneys] before they will be signed." The listing broker is named in said agreement as Nancy P. Reynolds.
Plaintiff is an active broker member of the Westfield Board of Realtors but is not the listing broker named in the aforesaid agreement signed by defendant.
Plaintiff received no written notice from the Board of the listing of defendant's property as aforesaid but learned of the same through "the grapevine." Plaintiff showed the house to a Mr. and Mrs. Rooke on Saturday, November 8, 1958, and on Sunday, November 9, 1958. Plaintiff received from her clients a check representing a down payment in the amount of $5,000. On Sunday plaintiff delivered the check of $5,000 to defendant and made an offer on behalf of the Rookes to purchase the property for $51,000. Defendant rejected this offer on Sunday. On the same day plaintiff raised the offer of the Rookes to the sum of $52,000. Defendant approved the price. Plaintiff drew a short form contract and procured the signatures of the Rookes thereto. The contract as signed by Mr. and Mrs. Rooke was presented to defendant on Sunday. However, defendant declined to sign it, stating that she would sign nothing until it was approved by her attorneys. Plaintiff then called a member of the law firm and arranged for an appointment for the following day, Monday, November *523 10, at 8:30 A.M. at the attorney's office. That morning plaintiff went to the home of defendant and drove her to the attorney's office. During the trip defendant repeated her willingness to sell the property to plaintiff's clients for the agreed sum of $52,000. Upon arriving at the attorney's office the check and the agreement signed by Mr. and Mrs. Rooke were delivered to the attorney. He had no specific objections to the agreement as drawn but decided to draw a new contract himself. The reason for the drawing of the new contract is best expressed in his own words:
"Q. I see. And could you tell us then what occurred when they came in at 8:30 on Monday? A. Well, I think I congratulated Mrs. Mercner on selling the house. I said in view of the circumstances I didn't want to use the board form of contract, that I would dictate our regular form of contract and that they could wait, and I dictated it. While it was being typed we just sat there and had a general conversation.
Q. Now, you mentioned under the circumstances. Were you referring to the fact that there was an estate involved? A. Well. there were two factors there. There was an estate involved and I thought that the purchaser was Mr. Rooke, Sr., not Jr., and I know that Mr. Rooke, Sr., is a very wealthy man, and anticipating that he might have some other attorney check the contract, I wanted to have a regular attorney's contract rather than a  this Westfield Board of Realtors form. I thought it was better in view of the amount involved to have the complete legal description instead of just a reference to lot size, and I just thought it was the proper way to handle it.
Q. Now, as I reconstruct it, then, the purpose of drawing a new contract was you were not certain who would represent the Rookes? A. That's right.
Q. And did you give another reason? A. I felt that it should be a formal contract because of the Fay situation, as I have explained. I didn't want to have anything go wrong with the closing of the title, and I felt that it was proper to have the complete legal description in.
Q. Yes. A. Substantially, that was the reason for using our form of contract.
Q. I see. Now then, had the broker's form contained that complete legal description, would there have been any objection on your part to that contract? A. There would have been no technical objection. I still would have insisted on putting it on my own form, as I did the Mitchell contract which you have here in evidence.
*524 Q. I see. Just for purposes of proper procedures, in other words? A. That's right."
The new contract was dictated by the attorney, whereupon the secretary withdrew for the purpose of typing the new contract as dictated. While it was in the process of being typed, and at approximately 9:30 A.M., the attorney was called out of the room in which the parties had been gathered while the new contract was dictated. About ten minutes later he returned and called defendant from the room. About ten minutes later he returned without defendant and informed plaintiff that defendant had accepted another offer of purchase at the price fixed in the listing agreement, to wit, $55,000. Meanwhile the secretary had completed the typing of the proposed new contract with Mr. and Mrs. Rooke, which contract, unsigned by either party, became an exhibit in the case.
A comparison of the original contract drawn by plaintiff and signed by her clients with the contract drawn by the attorney shows no significant difference except that the latter contained a metes and bounds description of the property.
Defendant sold the property in question to the purchaser produced by Miss Reynolds and paid her the usual commission. Thereafter plaintiff instituted this suit. The court below entered judgment thereon in favor of plaintiff in the sum of $2,558.40 representing a commission of 6% of $52,000, less so much of the commission as under the rules of the Westfield Board of Realtors became payable to said Board and to the listing broker.
Thereafter this appeal was taken.
Defendant contends: (1) the listing agreement contains conditions which plaintiff did not meet; (2) plaintiff did not comply with the terms of R.S. 25:1-9 in that plaintiff is not named in the brokerage agreement; and (3) the alleged offer and acceptance constituted a contract made on a Sunday and therefore was unenforceable.
*525 Defendant's second and third contentions may be easily disposed of. Defendant cites Shapiro v. Canada, 101 N.J.L. 425 (Sup. Ct. 1925), Heyman v. Stopper, 85 N.J.L. 128 (Sup. Ct. 1913), and Koehler v. Gilbert, 6 N.J. Misc. 769, 143 A. 84 (Cir. Ct. 1928), for the proposition that no broker may recover on an agreement to pay commissions unless expressly named therein. These cases do not so hold. They are authority for the proposition that the provisions of R.S. 25:1-9 are complied with only when the writing contains an authorization to sell and that no commission may be recovered in the absence of such authorization. The multiple listing agreement herein contained an expressed authorization, to wit, "the undersigned as owner hereby gives to said active broker members of the Westfield Board of Realtors the exclusive right to sell * * * the property described on the reverse side hereof * * *." Furthermore, the multiple listing agreement was directed to all active broker members of the Westfield Board of Realtors of which plaintiff was one. The recent case of Looman Realty Corp. v. Broad Street National Bank of Trenton, 32 N.J. 461 (1960), is ample authority for the proposition that an alleged party to a contract who is indicated, although not specifically named therein, may sue on the contract after proving that he was in fact an intended party.
As to the contention that the alleged offer and acceptance by plaintiff's client were effected on a Sunday and therefore the contract was unenforceable, it appears beyond question that defendant reaffirmed her agreement to sell while travelling with plaintiff to the attorney's office on Monday morning, November 10, and again at the office when the new contract was dictated without defendant at any time expressing any unwillingness to proceed with the sale of her home as thus agreed upon. The mere carrying out of negotiations on Sunday did not invalidate the contract completed on a secular day. Berry v. O'Neill, 92 N.J.L. 63 (Sup. Ct. 1918); Naylor v. Conroy, 46 N.J. *526 Super. 387, 390 (App. Div. 1957). Ratification of the oral Sunday contract on a secular day removed the taint of the statute. Heckel v. Burtchaell, 7 N.J. Super. 203, 206 (App. Div. 1950). The ratification makes it unnecessary to determine the effect of the Sunday laws on a right to recover arising out of the Sunday performance of a brokerage contract where the brokerage contract was executed on a secular day.
We return to the first contention, namely, that the listing agreement contained conditions which the plaintiff did not meet.
It is well settled that a broker is entitled to his commission when he has produced a buyer ready, willing and able to comply with the terms of the vendor. Todiss v. Garruto, 34 N.J. Super. 333, 338 (App. Div. 1955). To avoid such liability, the vendor may condition the payment of any commission upon an occurrence of an event, usually the consummation of the sale. Bruni v. Posluszny, 56 N.J. Super. 525 (App. Div. 1959). The instant case contains an agreement between the vendor and any other active member of the board of realtors that the commission should be due and payable on the date set for closing of title. This type of provision is construed to mean that the commission is earned when the contract of sale is made but that time for payment is deferred until title closes. See Hedden v. Folio, 62 N.J. Super. 470, 474 (App. Div. 1960), where Judge Sullivan stated:
"* * * once the seller accepts the buyer by entering into a contract of sale, * * * the broker is entitled to his commission * * *."
It is to be here noted that even though payment of the commission pursuant to a brokerage agreement is expressly conditioned upon the actual consummation of the sale, nevertheless the presence of such a contingency will not prevent recovery by the broker if the sale is defeated by the owner's own willful conduct. Blau v. Friedman, 26 N.J. 397, 401 (1958).
*527 The problem here raised is as to whether the doctrine of Hedden v. Folio, supra, requires the existence of a binding contract between defendant-owner and plaintiff's client before there arises the liability of defendant to pay plaintiff for the services admittedly rendered by plaintiff. Does the "willful" refusal of defendant to sign the written agreement with plaintiff's purchaser affect plaintiff's right to recover where plaintiff has in all respects performed her brokerage agreement? Here plaintiff produced a buyer who was ready, willing and able to purchase at a price lower than the stated listed price. Defendant agreed orally to all of the terms of the buyer produced by plaintiff. Thereafter she repudiated her oral agreement with plaintiff's purchaser. In Potts v. Thompson, 61 N.J. Super. 424 (App. Div. 1960), it was held that an owner was not liable to a real estate broker who produced a purchaser at the listed price where the owner had immediately prior thereto orally agreed to sell the property to another. Such latter sale was made by the owner himself pursuant to authority retained under the brokerage agreement. It was there held that the plaintiff-broker was not entitled to recovery, the court emphasizing that to allow plaintiff to recover would require defendant therein to rely upon the statute of frauds in repudiating his oral agreement. In the course of the discussion, the court said:
"In other words, the right of broker A to commission is defeated if broker B produces a buyer before broker A, even though broker B's buyer only agreed orally while broker A tenders his buyer's written contract."
Defendant appears to rely on the statute of frauds (R.S. 25:1-5(d)), which requires a contract for the sale of real estate to be in writing. Whatever her right with respect to plaintiff's client-purchaser might be, her reliance cannot dispose of her obligation to pay plaintiff who has in all respects performed her brokerage contract.
*528 Defendant also relies upon the so-called release clause contained in the brokerage contract. The wording of such clause refers to a single sale. Under the release clause, the payment of a commission by defendant to the broker whose purchaser ultimately bought effectively disposed of defendant's liability arising out of that sale. It does not dispose of defendant's liability in connection with another sale actually effected by plaintiff, which sale remains unconsummated only because of defendant's willful act. The so-called release clause was meant to dispose of multiple claims of competing brokers for obtaining a single purchaser to whom a sale is actually made. It cannot release multiple claims of competing brokers for obtaining multiple potential purchasers.
Defendant argues that to grant plaintiff relief here results in the payment of two commissions on a single sale of the house. Suffice it to say that such results entirely from the act of defendant herself in repudiating her oral agreement.
The judgment of the court below is affirmed.